2010 ME 20

**Patricia Ruth BEAL**

v.

**ALLSTATE INSURANCE COMPANY.**

Supreme Judicial Court of Maine.

Argued: Sept. 16, 2009.
Decided: March 11, 2010.

**734**

Arthur J. Greif, Esq. (orally), Julie D. Farr, Esq., Gilbert & Greif, P.A., Bangor, ME, for Patricia Ruth Beal.

Catherine R. Connors, Esq. (orally), Pierce Atwood LLP, Portland, ME, Daniel I. Billings, Esq., J. William Druary, Jr., Esq., Marden, Dubord, Bernier & Stevens, Waterville, ME, for Allstate Insurance Company.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, MEAD, GORMAN, and JABAR, JJ.

SAUFLEY, C.J.

[¶ 1] This appeal presents questions related to a high-low settlement agreement—between a person injured in an automobile collision and an underinsured tortfeasor—and the interplay of that agreement with the injured party's underinsured motorist insurance policy and Maine's underinsured motorist coverage statute, 24–A M.R.S. § 2902 (2009).

[¶ 2] Patricia Ruth Beal, who was injured in an automobile collision, appeals from a summary judgment entered in the Superior Court (Washington County, Cuddy, J.) in favor of her insurer, Allstate Insurance Company, concluding that, for purposes of her underinsured motorist claim, Beal was no longer "legally entitled to recover damages" after settling her claim for damages against the tortfeasor at the limits of his insurance. We conclude that Allstate may remain responsible to pay Beal pursuant to her underinsured motorist policy and section 2902, and we vacate the summary judgment entered in favor of Allstate. We affirm an earlier partial summary judgment entered in the Superior Court (Hunter, J.) in favor of Beal, collaterally estopping Allstate from relitigating the issue of the extent of Beal's damages.

## I. BACKGROUND

[¶ 3] At first blush, the facts established on the summary judgment record are straightforward. Patricia Beal, while a passenger in her parents' car, sustained injuries in a collision with a vehicle operated negligently by Toby Prosky. At the time of the collision, Prosky had $100,000 of automobile liability insurance coverage through Allstate. Beal had underinsured motorist (UIM) coverage through her parents' Maine Bonding and Casualty Insurance Company policy in the amount of $100,000 and through her own policy, coincidentally with Allstate, in the amount of $50,000, for a total of $150,000 in UIM coverage. See Connolly v. Royal Globe Ins. Co., 455 A.2d 932, 935 (Me.1983). Because Beal's total UIM coverage exceeded Prosky's total liability coverage by $50,000, Prosky was underinsured in the amount of $50,000. See id. at 936. The parties agree that Beal's parents' Maine Bonding UIM coverage was primary. See Cobb v. Allstate Ins. Co., 663 A.2d 38, 39–40 (Me. 1995). To the extent that her damages exceeded $100,000, Beal would ordinarily be entitled to UIM benefits through Allstate in an amount up to the $50,000 UIM policy limit. See 24–A M.R.S. § 2902(1); Connolly, 455 A.2d at 935, 936.

[¶ 4] As is often the case, however, the facts here are not that simple. In Beal's suit against Prosky, the parties agreed to liability on the part of Prosky and executed an agreement for "final determination" of Beal's damages through arbitration. The agreement stated: "Although strict conformity to the Rules of Evidence shall not be necessary, evidence, to be admitted [by the arbitrator], must be of a type that reasonable people would rely upon in addressing serious matters in their lives." The agreement also provided that the parties give advance notice of any witnesses and documents or medical records that they intended to introduce at the arbitration hearing.

[¶ 5] Entering arbitration, Prosky and his attorney sought to limit any recovery against Prosky personally to the $100,000 liability limit of his Allstate policy. To that end, the arbitration agreement contained a high-low provision that capped Beal's recovery from Prosky at $100,000:

The parties agree that regardless of the amount the arbitrator shall award, Plaintiff shall receive *from Defendant or his insurer* no less than $60,000 and no more than $100,000, except that the Defendant/Allstate shall get credit for prior payments totaling $1,714.49 on any amount due to Plaintiff. There shall be no prejudgment interest added to any amount awarded by the arbitrator.... The arbitrator shall not be advised of this part of the arbitration agreement.

(Emphasis added.) According to the terms of the agreement, the award would be reduced to judgment if not paid within fourteen days of the decision or, if the award were not reduced to judgment, Beal would execute a release and stipulation of dismissal in favor of Prosky.

[¶ 6] After the arbitrator determined that Beal's damages totaled $135,000, Allstate promptly paid $100,000 to Beal pursuant to the terms of the high-low provision. That payment was equal to the liability limits of Prosky's policy, and it offset Maine Bonding's primary UIM coverage.[1] *See Cobb,* 663 A.2d at 41. Beal and Prosky filed a stipulation of dismissal, and the court dismissed Beal's suit with prejudice without reducing the arbitration award to a judgment.

[¶ 7] Beal then sought to recover the remaining $35,000 in damages, plus interest and medical costs, from Allstate pursuant to her policy's UIM and medical payments benefits clauses.[2] Allstate declined to pay, and Beal brought this action seeking those payments. The court (*Hunter, J.*) first entered a partial summary judgment in favor of Beal, declaring that Allstate was collaterally estopped from relitigating the issue of total damages ($135,000) as determined by the arbitrator. The court (*Cuddy, J.*) later entered a summary judgment in favor of Allstate, denying Beal's claim for UIM benefits because it concluded that, after the high-low provision capped Beal's recovery from Prosky at $100,000, she was no longer "legally entitled to recover damages" pursuant to the terms of her UIM policy. Beal appeals from this judgment, and Allstate cross-appeals from the earlier judgment regarding collateral estoppel.

## II. QUESTIONS PRESENTED

[¶ 8] The execution of the high-low agreement between Beal and Prosky presents three issues. The first issue is whether Allstate, in its role as Beal's UIM carrier, is bound by the arbitrator's determination of the extent of Beal's damages. We agree with the court (*Hunter, J.*) that Allstate is collaterally estopped from relitigating the extent of Beal's damages.

[¶ 9] The second issue is whether Beal and Prosky intended the language of the high-low provision, which limited Beal's recovery "from Defendant or *his insurer* " to $100,000, to encompass Allstate's separate responsibility to provide UIM coverage to Beal because Allstate was also coincidentally "his insurer." We conclude that the plain language of the agreement did not limit Allstate's responsibility to provide UIM coverage to Beal.

---

1. The parties agree that Maine Bonding has no further responsibility to Beal and that its coverage is not at issue on appeal.

2. Allstate also insured Beal for $5,000 in medical payments benefits.

[¶ 10] The third issue is whether, after the implementation of the high-low provision, Beal was still "legally entitled to recover damages" from Prosky within the meaning of her UIM policy and 24-A M.R.S. § 2902(1). We conclude, contrary to the court's determination, that Beal's settlement with Prosky did not extinguish her legal entitlement to recover damages for the purposes of section 2902.

## III. DISCUSSION

### A. Standard of Review

[¶ 11] The trial court's decisions, first precluding Allstate from relitigating the issue of damages and then concluding that the high-low settlement extinguished Beal's legal entitlement to receive UIM benefits, were entered on partial and then final summary judgments. We review a court's entry of summary judgment de novo, viewing the evidence in the light most favorable to the nonprevailing party to determine whether the parties' statements of material facts and the record evidence to which the statements refer demonstrate that "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Molleur v. Dairyland Ins. Co.*, 2008 ME 46, ¶ 8, 942 A.2d 1197, 1200 (quotation marks omitted).

### B. Collateral Estoppel

#### 1. Finality of a Judicially Unconfirmed Arbitration Award

[¶ 12] Collateral estoppel applies to factual issues "determined by a prior final judgment." *Portland Water Dist. v. Town of Standish*, 2008 ME 23, ¶ 9, 940 A.2d 1097, 1100 (quotation marks omitted). Allstate contends that applying collateral estoppel in this case is not proper because the arbitration award was not reduced to a final judgment that was adopted or confirmed by the court. Whether a judicially unconfirmed arbitration award can be preclusive for the purposes of offensive collateral estoppel is an issue of first impression in Maine.

[¶ 13] In an analogous context, we have relied on the Restatement (Second) of Judgments to determine when a nonjudicial or quasi-judicial determination should be treated as a final judgment. In *Town of North Berwick v. Jones*, we held that a final adjudication in an administrative proceeding before a quasi-judicial municipal body had the same preclusive effect as a final judgment in a court proceeding because the administrative proceeding entailed the essential elements of adjudication. 534 A.2d 667, 670–71 (Me.1987) (citing 2 Restatement (Second) of Judgments § 83 (1982)); *see also Maines v. Sec'y of State*, 493 A.2d 326, 328–29 (Me.1985) (following section 83 of the Restatement to hold that determinations by state administrative tribunals could be final for purposes of res judicata). There, we based our analysis on the Restatement's recitation of the essential elements of adjudicatory procedure. *See Town of N. Berwick*, 534 A.2d at 670. These elements include:

> (1) adequate notice, (2) the right to present evidence and legal argument and to rebut opposing evidence and argument, (3) a formulation of issues of law or fact to apply rules to specified parties concerning a specified transaction, (4) the rendition of a final decision, and (5) any other procedural elements as may be necessary to constitute the proceeding a sufficient means of conclusively determining the matter in question.

*Id.* (quoting in part 2 Restatement (Second) of Judgments § 83(2)) (quotation marks omitted).

[¶ 14] Referencing these same elements, section 84 of the Restatement

states that a "valid and final award by arbitration has the same effects under the rules of res judicata … as a judgment of a court" unless the "procedure leading to the award lacked the elements of adjudicatory procedure prescribed in § 83(2)." 2 Restatement (Second) of Judgments § 84(1), (3)(b) (1982). To have preclusive effect, an arbitration decision must become final, 2 Restatement (Second) of Judgments § 84, cmt.e (citing 1 Restatement (Second) of Judgments § 13 (1982)), rather than remain "tentative, provisional, or contingent," 1 Restatement (Second) of Judgments § 13, cmt.b. Given the Maine Legislature's " 'strong policy favoring arbitration,'" *e.g., Barrett v. McDonald Investments, Inc.,* 2005 ME 43, ¶ 16, 870 A.2d 146, 149–50, and because the "purpose of collateral estoppel is to prevent harassing and repetitive litigation, to avoid inconsistent holdings which lead to further litigation, and to give sanctity and finality to judgments," *Van Houten v. Harco Construction, Inc.,* 655 A.2d 331, 333 (Me.1995) (quotation marks omitted), we adopt sections 84(1) and 84(3)(b) of the Second Restatement.[3]

[¶ 15] As between Beal and Prosky, the elements of adjudication were clearly present. Both parties had adequate notice of the arbitration proceeding. Procedurally, the arbitration agreement provided for both sides to present evidence (although not in strict conformity with the Rules of Evidence) and required advance notice of witnesses to be called and any documents or medical records that they intended to introduce. The arbitrator's award became final because the parties intended to submit the issue of damages for "final determination," and after the arbitrator's decision, Allstate tendered payment to Beal, thus obviating any need for Beal to reduce the award to an enforceable judgment of the court. Furthermore, on the parties' stipulation of dismissal, the court dismissed Beal's complaint with prejudice.

[¶ 16] On these facts, we conclude that the arbitrator's determination of damages related to Beal's tort claim against Prosky is sufficiently analogous to a final judgment for the purposes of collateral estoppel.

2. Collateral Estoppel Applied to Allstate

[¶ 17] The next question is whether collateral estoppel applies to Allstate, as Beal's insurer, which was not an actual party to the arbitration. Collateral estoppel applies "on a case-by-case basis if it serves the interests of justice." *Van Houten,* 655 A.2d at 333 (quotation marks omitted). Collateral estoppel " 'prevents

---

**3.** Other jurisdictions have applied collateral estoppel to arbitration awards that have concluded a dispute without being reduced to a judgment. *See Fisher v. Allstate Ins. Co.,* 136 Wash.2d 240, 961 P.2d 350, 353, 356–57 (1998) (holding that an underinsured motorist insurer was bound by a judicially unconfirmed arbitration award between its insured and a tortfeasor when the insurer did not participate in the arbitration but had notice of it and an opportunity to intervene); *Miles v. Aetna Cas. & Sur. Co.,* 412 Mass. 424, 589 N.E.2d 314, 317 (1992) (approving defensive use of an arbitration award for collateral estoppel, and stating, "[w]hen arbitration affords opportunity for presentation of evidence and argument substantially similar in form and scope to judicial proceedings, the award should have the same effect on issues necessarily determined as a judgment has") (quotation marks omitted); *see also Postlewaite v. McGraw–Hill, Inc.,* 333 F.3d 42, 48 (2d Cir. 2003) (stating that under New York law, collateral estoppel may apply to issues resolved in arbitration); *but see Patenaude v. John Hancock Prop. & Cas. Ins. Cos.,* 785 A.2d 563, 564 (R.I.2001) (holding that an arbitration panel's determination of damages was not preclusive for purposes of an insurer's subrogation claim because it was not confirmed by the court and, therefore, not equivalent to a final judgment).

the relitigation of factual issues already decided if the identical issue was determined by a prior final judgment, and the party estopped had a fair opportunity and incentive to litigate the issue in a prior proceeding.'" *Portland Water Dist.*, 2008 ME 23, ¶ 9, 940 A.2d at 1100 (quoting *Macomber v. MacQuinn–Tweedie*, 2003 ME 121, ¶ 22, 834 A.2d 131, 138–39). We have recognized factors to consider when determining whether a party has had a full and fair opportunity to litigate a claim, including

> the size of the claim, the forum of the prior litigation, whether the issue was a factual or a legal one, the foreseeability of future suits, the extent of the previous litigation, the availability of new evidence, the experience of counsel, indications of a compromise verdict, [and] procedural opportunities available in the second suit that were unavailable in the first.

*Hossler v. Barry*, 403 A.2d 762, 769 (Me. 1979) (citations omitted).

■■ [¶ 18] In addition, a party asserting nonmutual collateral estoppel—where the parties are not the same parties or privies to the prior proceeding—must establish that the party to be estopped was a party or in privity with a party in the prior proceeding. *See Van Houten*, 655 A.2d at 333; *Hossler*, 403 A.2d at 770 (eliminating the requirement of mutuality for purposes of collateral estoppel); *see also N.E. Harbor Golf Club, Inc. v. Town of Mt. Desert*, 618 A.2d 225, 227 (Me.1992) (distinguishing between being the same parties and being in privity for purposes of res judicata). The party resisting collateral estoppel has the burden of demonstrating that it would be prejudiced by its application. *Van Houten*, 655 A.2d at 333–34 (stating that the analysis of whether a party has been prejudiced involves the same factors relevant to whether a party

had a full and fair opportunity to litigate a prior claim, as listed in *Hossler* ).

■ [¶ 19] Here, there is no dispute that the factual issue of Beal's total damages as it relates to her Allstate UIM coverage is identical to the issue of damages determined by the arbitrator. We have also resolved, above, that this arbitration award satisfies the final judgment requirement for collateral estoppel. The issues remaining are whether Allstate, as Beal's UIM insurer, was a party to the arbitration proceedings or in privity with Prosky, and whether Prosky had a full and fair opportunity and incentive to litigate the issue of damages in the arbitration.

■ [¶ 20] Privity exists when two parties have a commonality of ownership, control, and interest in a proceeding. *Id.* at 333; *N.E. Harbor Golf Club*, 618 A.2d at 227. In *Van Houten*, we held that one employer could be collaterally estopped from relitigating the nature of an injury decided in a Massachusetts workers' compensation hearing involving another employer. 655 A.2d at 334. We reasoned that because the two employers had identical ownership and management and were insured by the same workers' compensation policy, there was "sufficient identity of ownership, control and interest" in the prior proceeding to establish privity for purposes of collateral estoppel. *Id.* at 333.

[¶ 21] The parties do not dispute that Allstate, as Prosky's liability insurer, provided counsel for Prosky in the arbitration proceeding, that this Allstate was the same company that insured Beal, or that Allstate was aware of the arbitration. In the arbitration proceeding, Prosky and Allstate had a goal of keeping Beal's damages at the lower end of the negotiated $60,000–$100,000 high-low range. If allowed to relitigate the issue of damages, Allstate would have substantially the same goal of

keeping Beal's damages as close to or below $100,000—the amount for which Maine Bonding's UIM coverage was primary. It is evident that whether providing UIM coverage for Beal or providing a defense for Prosky, Allstate's goal would be to minimize the arbitrator's determination of Beal's total damages. Viewing the facts in the light most favorable to Allstate, we conclude that Allstate, as Beal's UIM insurer, was in privity with Prosky.

[¶ 22] Next, considering the factors outlined in *Hossler,* we conclude that Prosky had a full and fair opportunity and incentive to litigate the issue of Beal's damages. *See* 403 A.2d at 769. The size of the claim and the extent of the previous litigation, in which both parties were adequately represented, were substantial enough that Prosky had incentive to defend the claim vigorously. The arbitration—a mutually agreed upon resolution of a complaint filed in the Superior Court—was a reasonable forum with adequate procedural opportunities for resolving damages. There is no indication of a compromise verdict because the arbitrator made his determination without knowledge of the high-low provision. Finally, on this record, there is no new evidence that would justify relitigation of the issue.

[¶ 23] Considering these same factors, *Van Houten,* 655 A.2d at 333–34, we also determine that Allstate failed to meet its burden of establishing that it would be prejudiced by application of collateral estoppel in this instance.

[¶ 24] To summarize: there was privity between Allstate, as Beal's UIM insurer, and Prosky; Prosky had a full and fair opportunity to litigate the issue of Beal's damages during arbitration; and Allstate has failed to demonstrate that collateral estoppel would result in prejudice. The court did not err in concluding that Allstate is collaterally estopped from relit-

igating the arbitrator's determination that Beal's damages totaled $135,000 and entering a partial summary judgment in favor of Beal.

## C. Beal's Underinsured Motorist Benefit Claim

[¶ 25] Notwithstanding the preclusive effect of the $135,000 arbitration award, the court ultimately concluded that Beal had agreed through the high-low provision to accept $100,000 in total compensation for her injuries, that she had received the full $100,000 through Prosky's insurance, and that, as a result, she ceased to have any "legal entitlement" to damages resulting from this accident. Beal argues that the arbitrator established her total damages at $135,000 and that she remains legally entitled to recover the $35,000 balance after settling her claim against Prosky and his insurer for $100,000 pursuant to the high-low provision. Resolution of this issue requires interpretation of the terms of the parties' arbitration contract, the language of Beal's UIM policy, and the purpose of 24–A M.R.S. § 2902.

### 1. The Arbitration Contract

[¶ 26] The interpretation of a contract and whether or not its terms are ambiguous are questions of law that we review de novo. *Farrington's Owners' Ass'n v. Conway Lake Resorts, Inc.,* 2005 ME 93, ¶ 10, 878 A.2d 504, 507. "[C]ontractual terms should be read in context to give effect to the intention of the makers of the instrument." *Id.* ¶ 11 n. 2, 878 A.2d at 508 (quotation marks omitted).

[¶ 27] According to the language of the arbitration agreement, the agreement was between Beal and Prosky. The agreement specified that "[t]he *parties hereto* agree to submit for final determination by arbitrator" all of Beal's claims "for personal injury and related damages." (Emphasis add-

ed.) The high-low provision stated that "[t]he parties agree that regardless of the amount the arbitrator shall award, Plaintiff [Beal] shall receive from Defendant [Prosky] or *his insurer* no less than $60,000 and no more than $100,000, except that the Defendant/Allstate shall get credit for prior payments...." (Emphasis added.) Finally, the agreement provided for Beal's release and stipulation of dismissal in favor of *Prosky*. There was no provision for the release of Beal's UIM insurer.

[¶ 28] A plain reading of these provisions leads to the conclusion that Allstate's responsibilities as Beal's UIM insurer were not addressed in the arbitration agreement. The language agreed to by the parties provided that Prosky and Beal intended for the arbitrator to determine all of Beal's "personal injury and related damages," but that regardless of that determination, Prosky and *"his insurer,"* would only pay Beal within the high-low range. The terms "his insurer" and "Allstate," used in the same sentence of the high-low provision, are not ambiguous and only refer to Allstate as Prosky's liability insurer. Furthermore, because "Allstate" is not mentioned elsewhere in the arbitration agreement, there is no other context that would suggest a different meaning. Contrary to Allstate's position, the arbitration agreement and its high-low provision did not reduce, eliminate, or directly address Allstate's responsibility to Beal, as her UIM insurer.[4]

[¶ 29] Thus, after Beal settled her damages up to the policy limits of Prosky's liability insurance, the question remains whether, pursuant to section 2902 and the terms of her UIM policy, she is still "legally entitled to recover damages from [the] owner[ ] or operator[ ] of [an] underinsured ... motor vehicle[ ]." *See* 24–A M.R.S. § 2902(1).

### 2. "Legally Entitled to Recover"

[¶ 30] Beal's UIM policy with Allstate provides, in part: "We will pay damages for bodily injury which an insured person is *legally entitled to recover from the owner or operator of an uninsured auto."* [5] (Emphasis altered.) The "legally entitled to recover" language of the insurance contract tracks with the language of section 2902:

> 1. A policy insuring against liability arising out of the ownership, maintenance or use of any motor vehicle may not be delivered or issued for delivery in this State with respect to any such vehicle registered or principally garaged in this State, unless coverage is provided in the policy or supplemental to the policy for the protection of persons insured under the policy who are *legally entitled to recover damages from owners or operators* of uninsured, *underinsured* or hit-and-run *motor vehicles*, for bodily injury, sickness or disease, including death, sustained by an insured person resulting from the ownership, maintenance or use of such uninsured, underinsured or hit-and-run motor vehicle.

24–A M.R.S. § 2902(1) (emphasis added).

[¶ 31] We have not had occasion to decide whether an insured who fully settles a

---

**4.** Allstate argues that if it is bound by the arbitrator's decision on the extent of damages, it must also receive the benefit of the high-low provision such that Beal's maximum recovery is the $100,000 she has already received. Allstate, however, conflates the concept of privity in the arbitration process with the effects of the chosen language of the high-

low contract. If the contract had contained language that absolved Allstate of its UIM responsibility, Allstate would prevail. The high-low contract, however, contains no such language.

**5.** The policy's definition of "uninsured auto" includes underinsured motor vehicles.

claim against an underinsured tortfeasor for the tortfeasor's insurance policy limits remains "legally entitled to recover damages" from the tortfeasor for the purposes of UIM coverage. There is a split of authority in other jurisdictions that have interpreted similar statutes and insurance policies. *See* 3 Alan I. Widiss & Jeffrey E. Thomas, *Uninsured and Underinsured Motorist Insurance* § 34.1, at 172–73 (Rev.3d ed.2005).

[¶ 32] Some courts have construed "legally entitled to recover damages [from a tortfeasor]" strictly and literally such that an insured's settlement with or release of a tortfeasor cuts off the insured's further legal entitlement to damages. *E.g., Nationwide Mut. Ins. Co. v. Nacchia,* 628 A.2d 48, 51–53 (Del.1993); *Gosselin v. Auto. Club Ins. Co.,* 574 A.2d 1243, 1246 (R.I.1990) (holding that an injured insured could not claim UIM benefits after settling with and releasing an underinsured tortfeasor because, as a result of the settlement, the insured was no longer "legally entitled to recover" from the tortfeasor pursuant to Rhode Island's UIM statute); [6] *see also* 9 Steven Plitt, Daniel Maldonado & Joshua D. Rogers, *Couch on Insurance 3D* § 123:20 (Rev. ed.2008).

[¶ 33] Other courts have construed "legally entitled to recover" to allow an insured to claim UIM benefits after settling with a tortfeasor. *See Gilbert v. Nationwide Mut. Ins. Co.,* 275 S.W.3d 690, 692–93 (Ky.2009) (citing *Coots v. Allstate Ins. Co.,* 853 S.W.2d 895, 900 (Ky.1993) (construing a UIM statute to accomplish its remedial legislative purpose, and holding that settlement with a tortfeasor does not abrogate

UIM coverage as long as the insurer has an opportunity to protect its subrogation rights)); *Farmers Alliance Mut. Ins. Co. v. Holeman,* 289 Mont. 312, 961 P.2d 114, 120 (1998) (interpreting a policy's "legally entitled to recover" language under contract law and holding that the entitlement exists at the time of the accident, not at the time of the UIM claim).

[¶ 34] We have previously held that the legislative purpose of section 2902 was to allow "an injured insured 'the same recovery which would have been available . . . had the tortfeasor been *insured* to the same extent as the injured party.'" *E.g., Jipson v. Liberty Mut. Fire Ins. Co.,* 2008 ME 57, ¶ 8, 942 A.2d 1213, 1216 (emphasis added) (quoting *Tibbetts v. Me. Bonding & Cas. Co.,* 618 A.2d 731, 734 (Me.1992)). By enacting section 2902, the Legislature has also indicated "a strong public policy in favor of the just compensation of accident victims." *Wescott v. Allstate Ins.,* 397 A.2d 156, 167 (Me.1979). To effectuate the purposes of this remedial statute, we construe the protections of section 2902 liberally in favor of insureds and strictly against insurers. *Molleur,* 2008 ME 46, ¶ 10, 942 A.2d at 1201; *Wescott,* 397 A.2d at 169. For the same reason, we construe limiting conditions in insurance policy contracts liberally in favor of insureds and strictly against insurers. *Wescott,* 397 A.2d at 167.

[¶ 35] Following this guidance, we decline to adopt a strict construction of the phrase "legally entitled to recover damages from [an underinsured]" as used in section 2902(1). Therefore, when an

---

6. Notably, the Rhode Island Legislature reacted to Gosselin's literal interpretation of the statute by amending the UIM statute so that "[r]elease of the tortfeasor with the consent of the company providing the underinsured coverage shall not extinguish or bar the claim of the insured against the underinsurance carri-

er regardless of whether the claim has been liquidated." *LeFranc v. Amica Mut. Ins. Co.,* 594 A.2d 382, 384 n. 1 (R.I.1991) (quoting 1990 R.I. Pub. Laws, ch. 340, § 1) (noting that the retroactive effective date of the amending legislation coincided with the date of the *Gosselin* opinion).

insured settles with an underinsured tort-feasor for the limits of the tortfeasor's liability insurance, the insured will remain "legally entitled to recover" damages from the tortfeasor for purposes of claiming UIM benefits pursuant to 24–A M.R.S. § 2902 if the injured party's damages exceed the tortfeasor's policy limits, and either (1) the UIM carrier consented to the settlement, or (2) there is no prejudice to the UIM carrier's subrogation rights resulting from its lack of consent to the settlement.

[¶ 36] In addition to effectuating the legislative purpose of section 2902, this holding is consistent with our policies of encouraging settlements between injured parties and their tortfeasors, *see Wescott,* 397 A.2d at 169; ensuring compensation for accident victims, *id.* at 167; and allocating the economic risks of injury fairly between primary insurers and UIM insurers, *see id.* at 166; *Levine v. State Farm Mut. Auto. Ins. Co.,* 2004 ME 33, ¶ 14, 843 A.2d 24, 29.

[¶ 37] Accordingly, we conclude that the court erred when it held that Beal ceased to be legally entitled to damages for purposes of her UIM benefits claim after the implementation of the arbitration agreement. Although the high-low provision capped the damages that Prosky and his insurer would have to pay Beal at the limits of Prosky's coverage, that settlement alone does not preclude Beal from seeking UIM coverage, and she remains legally entitled to $35,000 in damages pur-

suant to her UIM policy unless Allstate was prejudiced by a loss of its subrogation rights from Beal's failure to obtain Allstate's consent before settling her claim against Prosky. *See Greenvall v. Me. Mut. Fire Ins. Co.,* 1998 ME 204, ¶ 12, 715 A.2d 949, 954.

### 3. Allstate's Consent and Subrogation Rights

[¶ 38] Beal's UIM policy contains a no-consent-to-settlement clause, which reads: "Allstate will not pay any damages an injured person is legally entitled to recover because of: 1. bodily injury . . . to any person who makes a settlement without our written consent." (Emphasis omitted.) The purpose of no-consent-to-settlement clauses is to protect the insurer's subrogation rights [7] against a party released through a settlement. *Bazinet v. Concord Gen. Mut. Ins. Co.,* 513 A.2d 279, 282 (Me.1986); *Wescott,* 397 A.2d at 168. When an insurer consents to a settlement, it assumes the risk of losing its subrogation rights, and it cannot later deny a claim on the ground that its subrogation rights were prejudiced. Therefore, if Allstate had consented to or approved Beal's settlement, it could be precluded from denying Beal's claim pursuant to its no-consent-to-settlement clause. *See* 3 Widiss & Thomas, *Uninsured and Underinsured Motorist Insurance* § 34.1, at 172.

[¶ 39] Failure to obtain Allstate's consent to settlement would not, however, necessarily eliminate Beal's op-

---

7. Maine's UIM statute provides for the insurer's right of subrogation:

> 4. In the event of payment to any person under uninsured vehicle coverage, and subject to the terms of such coverage, to the extent of such payment the insurer shall be entitled to the proceeds of any settlement or recovery from any person legally responsible for the bodily injury as to which such payment was made, and to amounts recov-

> erable from the assets of the insolvent insurer of the other motor vehicle.

24–A M.R.S. § 2902(4) (2009). The right of subrogation allows a UIM carrier to indemnify and make whole its injured insured and then to seek to recoup its payment through subrogation of the tortfeasor. *See Peerless Ins. Co. v. Progressive Ins. Co.,* 2003 ME 66, ¶ 10, 822 A.2d 1125, 1128.

portunity to seek coverage pursuant to her UIM policy. *See Greenvall,* 1998 ME 204, ¶ 10, 715 A.2d at 954 ("When the insurer's subrogation rights are unaffected by the settlement, courts may not permit [no-consent-to-settlement] clauses to defeat the claim of insureds.") (citing *Bazinet,* 513 A.2d at 282). If Allstate did not consent to the settlement, then Beal could still be entitled to recover UIM benefits unless Allstate could "demonstrate prejudice as a result of the loss of subrogation rights" "from the insured's failure to obtain the insurer's consent before settling with the tortfeasor." *Id.* ¶¶ 11, 12, 715 A.2d at 954. By settling with and releasing Prosky through the high-low provision, Beal eliminated Allstate's capacity, as her UIM carrier, to seek recovery from Prosky through subrogation. *See id.* ¶ 11, 715 A.2d at 954. By itself, however, this would not prejudice Allstate's subrogation rights because Prosky may have limited or unreachable resources such that recovery through subrogation is not realistically available. *See id.* (citing *Galinko v. Aetna Cas. & Sur. Co.,* 432 So.2d 179, 182 (Fla.Dist.Ct.App. 1983)). As we held in *Greenvall,* Allstate has the burden of demonstrating prejudice by providing evidence of Prosky's financial situation as it relates to Allstate's subrogation rights. *See id.* ¶¶ 12, 13, 715 A.2d at 954–55; *see also Ouellette v. Me. Bonding & Cas. Co.,* 495 A.2d 1232, 1235 (Me.1985) ("In general, proof of prejudice to an insurer is a question of fact.").

[¶ 40] In this case, although Allstate was aware of the settlement, the summary judgment record does not reveal whether Allstate, in its role as Beal's UIM carrier, consented to or approved the settlement between Beal and Prosky. Similarly, the record is silent as to facts that would demonstrate whether Allstate's subrogation rights were prejudiced by Beal's settlement with Prosky.[8] If no consent to settlement was given, and Allstate can demonstrate on remand that Prosky had income or assets that could have been available for recovery by Allstate in a subrogation action against Prosky, then Allstate could demonstrate prejudice by violation of the no-consent-to-settlement clause. With prejudice demonstrated and the no-consent-to-settlement clause effective, any further recovery by Beal under the UIM policy would be barred.

[¶ 41] In sum, on the issue of Beal's claim for UIM benefits, Allstate was not entitled to judgment as a matter of law; the court incorrectly concluded that Beal was no longer "legally entitled to recover damages" from Allstate after settling her claim against Prosky. There remain, however, genuine issues of material facts regarding whether Allstate consented to Beal's settlement with Prosky and whether Allstate's subrogation rights against Prosky were prejudiced by the settlement. We conclude, therefore, that the court erred when it entered a summary judgment in favor of Allstate with respect to Beal's UIM benefits.[9]

---

8. On Beal's motion for summary judgment on the issue of UIM benefits, the parties focused on the legal issue of whether Beal was legally entitled to recover damages after implementation of the arbitration agreement. As a result, in their statements of material facts, neither party addressed the factual issues of consent to settlement or prejudice relating to Allstate's subrogation rights.

9. Because the court concluded that Beal could not reach her UIM benefits, it did not determine the amount of medical payments benefits to which Beal may be entitled pursuant to her Allstate policy; nor did the court assess prejudgment interest pursuant to 14 M.R.S. § 1602–B (2009). Because we remand the matter for further proceedings, we do not reach Beal's arguments on these issues.

746

The entry is:

Judgment vacated in part. Remanded for further proceedings consistent with this opinion.